FILED

2020 Sep-21  PM 12:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

[PUBLISH]

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

_____

No. 19-11405

_____

D.C. Docket Nos. 1:18-cv-00677-AKK; 17-bkc-40093-JJR7

LAW SOLUTIONS OF CHICAGO LLC,
UPRIGHT LAW LLC,
MARIELLEN MORRISON,

                                        Plaintiffs - Appellants,

versus

J. THOMAS CORBETT,

                                        Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(August 21, 2020)

Before ROSENBAUM and ED CARNES, Circuit Judges, and VINSON,[*] District
Judge.

_____

   [*] Honorable C. Roger Vinson, United States District Judge for the Northern District of
Florida, sitting by designation.

VINSON, District Judge:

Bankruptcy is a creation of statute, and those who practice bankruptcy law must comply with its myriad statutory provisions and implementing rules.[1] "Debt relief agencies" that represent "assisted persons," as those terms are defined in the Bankruptcy Code, have additional obligations under the statute. Law Solutions of Chicago LLC and UpRight Law LLC (jointly, "The UpRight Law Firm"), and an attorney with that firm, Mariellen Morrison (collectively, "UpRight"), qualify as debt relief agencies that represent assisted persons. By order dated April 19, 2018, the Bankruptcy Court for the Northern District of Alabama found that UpRight had violated several applicable provisions and rules, and it imposed sanctions against them. UpRight appealed the sanctions order to the District Court, which affirmed, and they now appeal to us. After review and oral argument, we also affirm.

## I.

"[W]hen a district court affirms a bankruptcy court's order, as the district court did here, this Court reviews the bankruptcy court's decision." *In re Brown*, 742 F.3d 1309, 1315 (11th Cir. 2014). As the "second court of review," we must independently examine the factual and legal determinations of the Bankruptcy Court and employ the same standards of review as the District Court. *In re Hood*,

---

[1] All sectional references in this opinion will be to the Bankruptcy Code, Title 11 U.S.C., and all rule citations will be to the Federal Rules of Bankruptcy Procedure.

727 F.3d 1360, 1363 (11th Cir. 2013).  We review the Bankruptcy Court's factual

findings for clear error and its legal conclusions *de novo*.  *Id.*  "Neither the district

court nor this court may make independent factual findings."  *In re Englander*, 95

F.3d 1028, 1030 (11th Cir. 1996).

The decision to impose sanctions is reviewed for abuse of discretion.  *In re*

*Hood,* 727 F.3d at 1363.  This standard of review is "extremely limited and highly

deferential."  *United Kingdom v. United States,* 238 F.3d 1312, 1319 (11th Cir.

2001); *see also United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004) (en

banc) (noting that "'deference . . . is the hallmark of abuse-of-discretion review'")

(quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997)).  "Such an abuse can

occur only 'when the bankruptcy judge fails to apply the proper legal standard or

to follow proper procedures in making the determination, or bases an award upon

findings of fact that are clearly erroneous.'"  *In re Beverly Mfg. Corp.*, 841 F.2d

365, 369 (11th Cir. 1988) (citation omitted).  Under abuse-of-discretion review,

there is a "range of possible conclusions" that the Bankruptcy Court could reach:

> By definition . . . under the abuse of discretion standard
> of review there will be occasions in which we affirm the
> district court even though we would have gone the other
> way had it been our call.  That is how an abuse of
> discretion standard differs from a *de novo* standard of
> review.  As we have stated previously, the abuse of
> discretion standard allows "a range of choice for the
> district court, so long as that choice does not constitute a
> clear error of judgment."

3

*Frazier*, 387 F.3d at 1259 (citations omitted); *accord McMahan v. Toto*, 256 F.3d 1120, 1129 (11th Cir. 2001) (noting that "under an abuse of discretion standard there will be circumstances in which we would affirm the district court whichever way it went"); *In re Rasbury*, 24 F.3d 159, 168 (11th Cir. 1994) ("Quite frankly, we would have affirmed the district court had it reached a different result, and if we were reviewing this matter *de novo*, we may well have decided it differently.").

When a Bankruptcy Court relies on several sources of authority for imposing sanctions, our task is to determine if the sanctions were allowable "under at least one of those sources of authority." *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1238 (11th Cir. 2007). "If any one of the sources of authority invoked by the [Bankruptcy Court] provides a sound basis for the sanctions, we must affirm the sanctions order." *Id.*; *accord* 2 James Wm. Moore, *Moore's Federal Practice* § 11.41[1] (3d ed. 2014) (noting same).

## II.

### A.

To provide the proper context, we begin by discussing the specific statutory provisions and rules at issue in this case.

An attorney representing a debtor is required by § 329(a) and Rule 2016(b) to file (and to amend or supplement as necessary) a disclosure with the court that sets the amount of compensation that she has been paid or will be paid ("Attorney

Disclosure" or "2016 Disclosure").  If the attorney qualifies as a debt relief agency, § 528(a) requires that she provide her clients with a written contract that "clearly and conspicuously" explains the services that will be provided to the client for the agreed upon charge ("Retention Agreement").  If these documents are materially inaccurate, the attorney may have potentially violated several statutory provisions and rules.

First, Rule 9011(b) provides that by filing a pleading "or other paper" with the Bankruptcy Court the attorney is certifying that she has conducted a reasonable inquiry and, to the best of her knowledge, information, and belief, the contentions therein have "evidentiary support."  Section 707(b)(4)(B) provides that "[i]f the court finds that the attorney for the debtor violated rule 9011 . . . the court, on its own initiative or on the motion of a party in interest," may order "the assessment of an appropriate civil penalty against the attorney for the debtor[.]"

Similarly, and even more expansively, § 707(b)(4)(C)-(D) provides that an attorney's signature on a pleading, petition, or motion is certification that she has investigated the circumstances giving rise to that document and determined that it is well grounded in fact and warranted by existing law, and that it contains correct information.  If an attorney violates this provision, she can be sanctioned under the Bankruptcy Court's inherent contempt power or its statutory civil contempt power in § 105(a), which provides, in relevant part, that "[t]he court may issue any order,

5

process, or judgment that is necessary or appropriate to carry out the provisions of this title."[2]

Lastly, and most notably for this case, § 526(a)(2) provides that:

> (a) A debt relief agency shall not—
>
> * * *
>
>> (2) make any statement . . . in a document filed in a case or proceeding under this title, that is untrue or misleading, or that upon the exercise of reasonable care, should have been known by such agency to be untrue or misleading[.]

If a debt relief agency is found to have intentionally violated this provision, or was "engaged in a clear and consistent pattern or practice of violating [it]," § 526(c)(5) authorizes the Bankruptcy Court to enjoin the violation and impose an appropriate civil penalty against the offender.

In sum, if a debt relief agency files an Attorney Disclosure that is without evidentiary support, incorrect, untrue, and/or misleading, the Bankruptcy Court could potentially impose civil sanctions under Rule 9011; its statutory contempt authority in § 105; its inherent contempt authority; or § 707 and § 526.

B.

---

[2] As this Court has observed: "Distinct from the bankruptcy courts' inherent contempt powers, 11 U.S.C. § 105 creates the bankruptcy courts' statutory civil contempt power." *In re Ocean Warrior, Inc.*, 835 F.3d 1310, 1316 (11th Cir. 2016).

6

With the foregoing provisions and rules in mind, we will now discuss the background of this case. To fully and accurately capture what took place below, we will at times quote extensively from the record.

The UpRight Law Firm is a large legal operation with its principal office in Chicago, Illinois. It is an amalgamation of hundreds of attorneys and various law firms that cooperate to provide legal services, including bankruptcy representation, to clients in all 50 states. The firm solicits clients through the internet and refers them to "partners" who practice in the specific locality where the clients reside. The Bankruptcy Court found—and it doesn't appear to be in dispute—that the local attorneys affiliated with The UpRight Law Firm have very little, if any, input into how the firm's business is conducted; they appear to be "partners" in name only.

At the time relevant to this case, Morrison was a Birmingham attorney and an UpRight "partner." Per her partnership agreement, she accepted bankruptcy referrals from the firm and represented those debtors in the Bankruptcy Court for the Northern District of Alabama. Although she was designated a partner of The UpRight Law Firm, she never voted at (or even attended) a partnership meeting; she never received a year-end draw or distribution of any kind; and she didn't know the names of other attorneys in the firm (and, in fact, couldn't even provide an estimate as to how many other attorneys there were).

7

In 2016, UpRight was representing debtors in two Chapter 7 cases that had been filed in the Northern District of Alabama, *In re Cook*, Case No. 15-41812, and *In re Mikulin*, Case No. 15-83322.  The Attorney Disclosures that UpRight filed in those cases indicated that the debtors paid UpRight a flat fee that covered basic bankruptcy representation, e.g., financial counseling and preparation of the petition and schedules.  However, the flat fee didn't entitle the debtors to an array of other bankruptcy services that were excluded in Paragraph 9 of their Retention Agreements, but which they might need in their cases ("Excluded Services").  The filings in *Cook* and *Mikulin* form the underpinnings of this case.

On April 5, 2016, J. Thomas Corbett, the Bankruptcy Administrator ("BA") for the Northern District of Alabama, brought two adversary proceedings ("APs") against UpRight in the *Cook* and *Mikulin* cases.[3]  APs are "governed by special procedural rules, and based on conflicting claims usually between the debtor (or the trustee) and a creditor or other interested party."  *See* Black's Law Dictionary

---

[3] The six federal judicial districts in Alabama and North Carolina are the only districts in the country that have a Bankruptcy Administrator instead of a Bankruptcy Trustee.  *See* Dan J. Schulman, *The Constitution, Interest Groups, and the Requirements of Uniformity: The United States Trustee and the Bankruptcy Administrator Programs*, 74 Neb. L. Rev. 91, 119-23 (1995) (describing the history of the United States Trustee Program and discussing why Alabama and North Carolina opted out).  While the Bankruptcy Reform Act of 1994 "diminishe[d] some of the practical differences between" the two programs, they remain constitutionally distinct as they fall under different branches of government.  *Id.* at 93-94.  Specifically, Bankruptcy Trustees are part of the executive branch, whereas Bankruptcy Administrators are part of the judicial branch.  *Id.* The BA is an independent officer of the judiciary who operates with a full time staff and is completely independent of the Bankruptcy Court and the District Court.

(11th ed. 2019).  Although they are generally viewed as "'stand-alone lawsuits,'"

*In re Boca Arena, Inc.*, 184 F.3d 1285, 1286 (11th Cir. 1999) (citation omitted),

they are usually initiated—as they were here—by filing a complaint in the same

court that is handling the bankruptcy petition.  *See* Fed. R. Bankr. P. 5005(a)(1);

7003.

    The complaints in the *Cook* and *Mikulin* APs asserted multiple claims, the

most significant of which concerned UpRight's purported involvement in a car

repossession scheme (known as the "Sperro/Fenner repo scam") that was utilized

to pay the attorney and filing fees in the two cases.[4]

    The BA and UpRight subsequently went to mediation, where they agreed to

a proposed settlement of the APs in the *Cook* and *Mikulin* cases.  In relevant part,

the proposed settlement agreement ("Settlement Agreement") required UpRight to

pay each bankruptcy estate $25,000 (for a total of $50,000), and it required the

---

[4] The "Sperro/Fenner repo scam" isn't directly relevant to this appeal, so we don't need to discuss it in great detail.  Stated briefly, the alleged scheme was as follows: When a potential client contacted The UpRight Law Firm, he would be asked if he owned an encumbered vehicle that he intended to surrender to the secured creditor.  If the client said yes, he was referred to Sperro LLC or Fenner & Associates LLC—companies controlled by a business associate of the firm—and they would take possession of the vehicle and pay the attorney and filing fees for the client's bankruptcy case.  Sperro/Fenner would then tow the vehicle to another state; notify the secured creditor that its collateral was in storage at their facility; and give the creditor just a few days to pay large fees for loading, towing, and storing expenses.  If the creditor refused to pay, the vehicle was sold at auction.  This scheme not only harmed the secured creditors, of course, but it exposed the debtors to potential civil and criminal liability, in addition to subjecting them to claims by the creditors for nondischargeability of debts and jeopardizing their discharge and financial "fresh start" under the Bankruptcy Code.

firm to self report to the Alabama State Bar and hire a full-time licensed Alabama

attorney for its main office in Chicago.  The Settlement Agreement also precluded

UpRight from filing any new bankruptcy cases in the Northern District of Alabama

for six months, from September 1, 2016, until March 1, 2017, which was referred

to as the "Interim Period."  After March 1, 2017, Upright was allowed to file new

cases for clients who had retained them during or after the Interim Period, subject

to the following proviso in Paragraph 6 of the Settlement Agreement:

> For those clients who retained UpRight prior to March
> 21, 2016 [("Covered Clients")], UpRight shall provide
> the [Excluded Services] referred to in Paragraph 9 of
> UpRight's standard client retention agreement[5] without
> additional charge for attorney's fees . . . . This paragraph
> shall affect only those bankruptcy cases filed by UpRight
> for clients who retained the firm prior to March 21, 2016
> for bankruptcy representation in the Northern District of
> Alabama.

On September 23, 2016, the BA filed a motion for the Bankruptcy Court to

approve the Settlement Agreement, and the court held a hearing on the motion on

October 27, 2016.  The BA's attorney, Robert Landry, told the Bankruptcy Court

during the hearing that although the complaints in the APs had raised a number of

ethical violations, UpRight had already hired an Alabama attorney for its Chicago

---

[5] These "Excluded Services" included dischargeability proceedings, motions for stay
relief, motions to redeem property, lien avoidance, contested matters or APs, amendments to
schedules, contested exemptions, Rule 2004 examinations, continued 341 creditor meetings,
motions to abandon or sell property, performing statement of intentions, monitoring an asset
case, and help with reaffirmation agreements.

10

office and self-reported to the Alabama Bar, which the BA expected would solve the vast majority ("85 to 90 percent") of the ethical problems alleged in the APs. As for the Sperro/Fenner repo scam, the BA advised the Bankruptcy Court that he believed the Settlement Agreement was reasonable under the circumstances as it was not clear to what extent UpRight was culpable in the scheme. Specifically, Landry told the court (emphasis added):

> MR. LANDRY:  I mean, I think the $50,000—and that's exactly what we've asked for almost in our complaint. It's real—it might not be a lot of money to other folks, but it's a lot of money for lawyers in Alabama that screw up. . . . So it's a real penalty and a real sanction.  And to report it to the Alabama Bar and having to hire a lawyer, I mean, you know, *we've done the best we can.  It's a hard case.  There's factual problems on both sides of the table.*

The Bankruptcy Court agreed that $50,000 was a sufficient penalty, and it stated from the bench that it would approve the proposed Settlement Agreement. Later that day, the Bankruptcy Court entered a short order to that effect ("Agreed Order").  The Agreed Order didn't adopt, repeat, paraphrase, or incorporate any of the specific terms of the Settlement Agreement.  Importantly, it also didn't say that the Bankruptcy Court would retain jurisdiction over performance of the agreement. It merely said, in relevant part, "the Compromise is **APPROVED**."

Approximately seven months later, during a routine audit of UpRight's pending cases, the BA discovered that in three Chapter 7 cases filed on behalf of

11

Covered Clients—*In re White*, Case No. 17-40093; *In re Calloway*, Case No. 17-40462; and *In re Tidwell*, Case No. 17-40599 ("Open Cases")—the Attorney Disclosures filed in those cases stated that UpRight *would* require the payment of additional fees for the Excluded Services that they had agreed to provide without extra charge under Paragraph 6 of the Settlement Agreement.  Shortly thereafter, on May 19, 2017, the BA filed three substantively identical "motions to examine" with the Bankruptcy Court.  The motions asked the court to examine the debtors' transactions with UpRight in the three Open Cases and determine if the Attorney Disclosures filed in those cases violated the terms of the Settlement Agreement. The BA stated his belief that the disclosures were in direct conflict with the Settlement Agreement and that the conflict rendered them materially inaccurate, untrue, and/or misleading in violation of § 707, § 526, and Rule 2016.  The motions concluded as follows:

> If the Court finds that Morrison, UpRight Law LLC and Law Solutions Chicago LLC are not in compliance with the terms of the Settlement Agreement, filed a materially inaccurate 2016 Disclosure and/or violated the other code provisions set forth herein, [the Court should] enter an order setting a show cause hearing as to why appropriate sanctions, including but not necessarily limited to, disgorgement of attorney fees, civil penalties and/or an injunction under § 526(c)(5), sanctions under § 105, and other sanctions under this Court's inherent authority should not be imposed against [them].

After the BA filed the motions to examine (but before the Bankruptcy Court took any action on the motions), UpRight filed amended disclosures in the Open Cases. The Bankruptcy Court held a hearing on July 13, 2017. The BA conceded at the start of the hearing that the amended disclosures appeared to be consistent with the Settlement Agreement, but he argued that was only done after and because he had filed the motions to examine. The BA further stated: "[T]he rub is not just the fact the disclosures [were] wrong, the real rub and crux is that I don't have any information to indicate they ever told these debtors, until after we filed the motion, possibly—I don't really know—that the scope of services was different than their original contract." The BA asserted that it appeared UpRight had thus violated § 707, § 526, and Rule 2016, and he stated:

> MR. LANDRY:  . . . And so, what we're asking the Court today is to look at those basic facts and determine whether or not there's been violations of those provisions. And if there are, ask the Court to set it for a show cause hearing as to why there shouldn't be sanctions or penalties for this.

UpRight was represented at the hearing by attorney Valrey Early, and he told the Bankruptcy Court as follows:

> MR. EARLY:  . . . [T]he BA is correct, mistakes were made in those particular filings. They should not have been made.

\* \* \*

13

> And if you'll recall, there was considerable question
> earlier about excluded services and hourly rates to be
> charged for those services and APs and so forth and so
> on.  UpRight has not charged a nickel, has not sought a
> nickel, will not seek a nickel in any of those matters.
> Their disclosures are now correct.  Did it take a prod?
> Yes, it did, to make sure that everything was—all the I's
> were dotted, all the T's were crossed.
>
> And please understand, I'm not trying to minimize this.  I
> get it. . . . Should they disgorge the fees in these three
> cases?  I think I can—putting on a different hat for the
> moment, I think I can; yes, they should.

The BA responded by telling the Bankruptcy Court that he had conducted a

review of UpRight's other cases involving Covered Clients and discovered at least

three *other* Attorney Disclosures that violated the Settlement Agreement.  Those

three cases, which had at that point already been closed, were: *In re Conlin*, Case

No. 17-00999; *In re McDaniel*, Case No. 16-72114; and *In re Jackson*, Case No.

17-70171 ("Closed Cases").  The BA continued:

> MR. LANDRY:  At one of the prior hearings, they talked
> about how we retained an Alabama lawyer in the
> Chicago office to fix everything.  Okay, that happened
> March 21st.  That's the date we're using because after
> that date, everything should be in order.  It's a joke,
> Judge.  They ignored that settlement agreement.  Nobody
> cared—Morrison, UpRight—no one cared to double-
> check it.  They can't just thumb their nose at that order.
> They don't care.  And so I think we need to have a
> sanction hearing on it and, you know, disgorgement
> might not be enough.
>
> THE COURT: Mr. Early?

14

MR. EARLY:  Well obviously, Mr. Landry and I disagree on the severity of this.  Were mistakes made?  Yes, they were.  Have reasonable efforts been made to resolve those mistakes?  So far, yes.  Do we need to make more efforts?  Perhaps we do . . . .

THE COURT:  But isn't that beside the point?

MR. EARLY:  Is it beside the point?

THE COURT:  I mean, there was an order in a very serious matter—

MR. EARLY:  Yes, sir.

THE COURT:  —and frankly, I think there were some bullets dodged.  And if I had been sitting in Chicago, I wouldn't want to come back to Alabama and have to address this again.  And the business model of sitting up there in Chicago and handling cases, I assume, nationwide—

MR. EARLY: Yes, sir.

THE COURT:  —is just a—it just reeks with ethical issues, and people getting on the phone and retaining a lawyer in Chicago when they're down here in Calhoun County, Alabama.  And why that lawyer thinks that they can represent that debtor and become intimate enough with what they need is beyond me.  But that may not be something I'm—it may have to go somewhere else.  But, you know, ya'll settled that and that it is.

There was an article recently written in the American Bankruptcy Journal about internet lawyers representing out-of-state debtors in cases and the ethical issues with that.  Those aren't really, I guess, before me.  They may be, eventually.

15

I'm going to look at this.  Let me go back.  I need to look
at the settlement agreement again and look at this, and
then I'll get an order out on it.  I'll tell you, in all
likelihood, that there probably will be another hearing on
this. . . . And if so, I think at that hearing, we'll probably
need to hear from the folks up in Chicago in person.

The next day the Bankruptcy Court entered an "Order to Appear and Show

Cause."  The order didn't mention § 707, § 526, or Rule 2016.  It read, in relevant

part, as follows:

Previously, the court issued an order that approved a
settlement agreement among Debtors' Counsel and the
BA pertaining to, *inter alia*, the scope of representation
by Debtors' Counsel of their debtor-clients who filed
cases under title 11 in this court, i.e., the Eastern Division
of the Northern District of Alabama.  Specifically, the
settlement agreement, implemented by this court's order,
prohibited Debtors' Counsel from limiting the scope of
their representation of their debtor-clients who had
retained Debtors' Counsel before a specific date.
Debtors' Counsel admitted they did not fully comply
with the settlement agreement, and the BA argues that
sanctions are mandated due to such non-compliance.

The court concludes that a hearing is necessary for the
court to determine the extent to which Debtors' Counsel
failed to comply with the order approving and
implementing the settlement agreement, as well as the
reasons for any noncompliance, in all cases encompassed
by the order approving and implementing the settlement
agreement, and to further determine what sanctions, if
any, are appropriate due to such noncompliance.

Accordingly, each of Debtors' Counsel is ORDERED to
appear, in person and with counsel, before this Court on
**August 24, 2017 at 1:30 p.m.** in the Bankruptcy
Courtroom, U.S. Federal Courthouse, 1129 Noble Street,

16

Room 117, Anniston, Alabama, and show cause, if there
be any, why their failure to comply with the settlement
agreement and order implementing the same does not
warrant contempt sanctions, which may include
disgorgement of fees and expenses paid by debtor-clients
whose cases were subject to such agreement, and
additional monetary and non-monetary sanctions, which
may include, without limitation, a bar from Debtors'
Counsel, or any of them, practicing in the United States
Bankruptcy Court for the Northern District of Alabama
(all divisions) for a period of up to two (2) years, and
reporting their conduct to the bar associations where they
are licensed.

The Bankruptcy Court held an evidentiary hearing on August 24, 2017.  The

BA called Morrison as a witness during the hearing, and evidence was introduced

to support the BA's claim that the Attorney Disclosures filed in at least six cases—

the three Open Cases, and the three Closed Cases—didn't comply with Paragraph

6 of the Settlement Agreement (collectively, "the Post-Settlement Cases").

UpRight called David Menditto, the firm's Associate General Counsel of

Litigation, to testify at the hearing.  Menditto testified that although UpRight had

believed that their original Attorney Disclosures complied with Paragraph 6 of the

Settlement Agreement—and that they didn't intentionally violate the provision—

he conceded that UpRight had made "mistakes" in the filings and said he was there

to "take responsibility" for those mistakes.  However, Menditto emphasized that

although the original Attorney Disclosures may have been a "mistake," none of the

debtors was actually charged for the Excluded Services.  But Menditto conceded

17

on cross examination that the language in the disclosures (which told the debtors

that UpRight *would* charge extra for the services if the debtors had needed and

requested them) was "inconsistent" with Paragraph 6 of the Settlement Agreement.

At the conclusion of the hearing, the Bankruptcy Court invited the attorneys

to file follow-up briefs (simultaneous opening briefs and simultaneous replies) to

address any issues that they wanted to argue. But the Bankruptcy Court stated the

following from the bench:

> THE COURT: The circumstances in this case disturb
> me. And I have—I'm trying to separate it in my mind
> that the business model that UpRight uses strikes me as
> unusual. And I think even this—at this day and time,
> most lawyers and judges would agree with me.
> However, I think if—like a lot of things that are in the
> digital world now, if you had the ability to look into
> where we're all going with this it probably wouldn't be a
> surprise. And this may be—excuse me. This may be the
> way of the future. I don't know.
>
> * * *
>
> What concerns me in this case is that the BA recognized
> a problem, what was going on, and legitimately
> addressed it. And the UpRight Law firm, Ms. Morrison,
> and the BA then went to mediation. And at the time,
> there were some other matters going on with those firms.
> And what I'm primarily referring to is this repo outfit
> that was absorbing the firm (indiscernible). And that
> really bothered me. It really did. But I'm assuming,
> knowing Mr. Landry, that he got comfortable that there
> was no culpability on behalf of UpRight with that.
> Because when I saw that, I said this is serious.

18

. . . . So I was glad that went away.  But that disturbed
me.  But I was aware of it.

But what concerns me was we entered into a settlement
agreement with a law firm with a federal judge and that
the firm should have bent over backwards to make sure
there was absolute compliance with that consent
agreement, which was then made—or approved by this
Court's order.  And that's what concerns me is that I
can't help but get the feeling that, okay, we've got this
behind us, we'll cough up $50,000, and we'll go our way.
And that it was just pretty well after that ignored. . . .

* * *

So if you all want to address that in a brief, I guess
primarily UpRight, then—and, you know, there's no
blood that was spilled.  But it still concerns me.  And as I
understand the law, folks, is when I issue an order and
it's not complied with and the party that is in non-
compliance is aware of it, I cannot ignore that.

* * *

So I guess I'm telling you that, you know, I'm going to
enter an order that—and they'll be some repercussions.
And, you know, how severe?  I have no ambitions of
trying to put UpRight out of business, at least not
permanently, either financially or because of some other
reason, but—

So why don't you all give me something in writing, what
you think is appropriate and the reasons why.

The Bankruptcy Court continued by saying that "the significant thing" was

that UpRight had filed several cases where "there should not have been excluded

services," but "notwithstanding the agreement, they were."  At that point, counsel

19

for UpRight asked: "Is Your Honor inviting briefing on the question of whether or not UpRight failed to comply with that section 6?  Because it feels like Your Honor has already made that decision.  And we don't want to brief something that Your Honor has already heard enough of."  The court replied that the attorneys could try in their briefs to "convince me otherwise," but

> I'm very much leaning towards that just from what I see here [because] we have retention agreements and we have disclosures that do exclude certain services, but in fact under the settlement agreement during those cases that fall in that category that wasn't to be done.  And what concerns me, if I'm a, you know, probably pretty unsophisticated Chapter 7 debtor, I look down there and say, well, there's no reason—I don't have any more money so I can't—there's no reason for me to call on this firm to do [those services].  I don't know whether that happened or not.  We don't know. . . . But, no, convince me of anything you want me to do.

In his post-hearing briefing, the BA argued that UpRight had violated the terms of the Settlement Agreement in the Post-Settlement Cases and that in doing so they "repeatedly violated basic requirements of the Bankruptcy Code and Rules applicable to attorneys and debt relief agencies."  He argued that the Settlement Agreement required UpRight to provide the Excluded Services for no additional fee, which required notification to the debtors of the availability of those services.  To instead tell them in the Attorney Disclosures that the services weren't included was tantamount to denying them the services insofar as it led them to believe they weren't provided.  The BA argued that sanctions were appropriate under the same

20

provisions that he cited in his motions to examine, including, *inter alia*, § 707 and § 526.  UpRight had the opportunity to respond to the BA's argument on this point (and did respond) in their reply brief, and they argued that those provisions had not been violated (at least not intentionally).

The Bankruptcy Court issued its Memorandum Opinion and Order on April 19, 2018.  The opinion began with a discussion of the Sperro/Fenner repo scam. Although the Bankruptcy Court acknowledged that the *Cook* and *Mikulin* APs had been settled (and "thus, the impropriety, if not illegality, of that scheme is not an issue that must be explicitly decided in the matters currently before the court"), it discussed the repo scam at length.  The Bankruptcy Court stated that it felt the scheme was relevant to assessing UpRight's "motives" and that it bore on "their pattern and practice of questionable conduct in the contested matters now before the court."

As to those motives and questionable conduct, the Bankruptcy Court found that UpRight "simply ignored" their obligations under the Settlement Agreement because they were "under the misconception that the BA . . . would not discover their non-compliance."  According to the court, the untrue statements in the Attorney Disclosures "were not the result of a simple oversight or excusable neglect."  Rather, they constituted "arrogant disregard" and "indifference" by UpRight, which was "tantamount to an intentional misrepresentation."  The

21

Bankruptcy Court strongly suggested that this was bad faith—although it did not

explicitly use those words—because:

> If the Defendants had been acting in good faith and
> wanted to demonstrate the same to the court and BA,
> they would have closely monitored their case filings in
> this District to make certain their Attorney Disclosures in
> the Post-Settlement Cases complied with the Settlement.
> They did not.

The court acknowledged that UpRight had filed amended disclosures in the

Open Cases, but it dismissed those amendments as "self-serving" and "too little,

too late."  It noted that the amended disclosures only came after the BA had filed

the motions to examine and after UpRight knew that they faced possible additional

sanctions, which indicated that they were "not motivated by a good faith attempt to

correct an inadvertent oversight."  The Bankruptcy Court continued:

> The Defendants maintain that they did not breach the
> terms of the Settlement in spite of their continued use of
> the services-exclusion-language in Post–Settlement
> Cases because the Settlement did not expressly require
> that Retention Agreements and Attorney Disclosures for
> yet-to-be-filed Post–Settlement Cases conform to the
> Settlement's requirements.  That argument is
> incredulous; the Defendants have missed the point.  The
> Settlement was for the benefit of the debtors in the Post–
> Settlement Cases, who knew nothing about the
> Settlement.  Those debtors knew only what the
> Defendants disclosed in their Attorney Disclosures and
> Retention Agreements, which misrepresented the
> services the debtors were entitled to receive from the
> Defendants.  If the debtors were not made aware of the
> scope of legal services they were entitled to receive in
> return for their flat fee payment, then the Settlement's

> requirement that the scope of services be expanded was
> illusory and of no benefit to anyone—other than the
> Defendants as a small price to pay for settling [the APs].

Although the Bankruptcy Court acknowledged there was no evidence that a debtor had requested and was charged for the services (and thus, as it noted at the evidentiary hearing, "no blood . . . was spilled"), the court stated that it "cannot ignore the chilling effect that the exclusionary language necessarily imposed on cash-strapped debtors who may have been in need of further representation they could not afford." The Bankruptcy Court concluded that "debtors were misled by the Defendants, and the debtors were necessarily harmed when they were given the wrong information regarding the scope of services the Defendants would provide for the flat fee." Notably, the court observed that UpRight had not filed *any* cases on behalf of Covered Clients that had Attorney Disclosures in compliance with the Settlement Agreement. Thus, the Bankruptcy Court surmised, it was reasonable to assume "that if there were a hundred Post-Settlement Cases instead of six, none of the Attorney Disclosures would have complied with the Settlement."

Based on these findings, the Bankruptcy Court held that UpRight violated Rule 9011, § 707, and § 526, and it imposed monetary sanctions totaling $150,000 ($25,000 for each of the six Post-Settlement Cases), and it ordered disgorgement of all attorney and filing fees in those cases. Pursuant to § 105, the Bankruptcy Court next imposed non-monetary sanctions; to wit, it revoked The UpRight Law Firm's

23

authority to file cases in the Northern District of Alabama for a period of 18 months (three months for each of the six cases) and revoked Morrisson's filing privileges for a period of 60 days, and it provided for a refund of fees and expenses paid by unfiled clients impacted by the revocation.  The Bankruptcy Court concluded that the sanctions it imposed were warranted "to enforce compliance with its orders—i.e., the Agreed Order—and to prevent further abuse of the bankruptcy process by the Defendants, who have shown themselves undeterred by the original sanctions imposed by the Settlement."

Throughout the course of its opinion and order, the Bankruptcy Court made a number of negative comments about The UpRight Law Firm and what the court perceived to be its ethically-questionable business model.  It referred to the firm as a "bankruptcy mill" and "high-volume, monolithic . . . internet cartel" that used "marketing strategies . . . often at the expense of their clients."  It said that UpRight was after "profits," not "public service," and that its argument to the contrary was "absurd."  And it concluded with an explanation of why some leniency was being given to Morrison:

> With respect to why the court imposed sanctions against UpRight that are harsher than those imposed against Morrison (although Morrison and UpRight are jointly and severally liable for the $150,000 civil penalties as well as fee and expense disgorgement), the court is convinced that Morrison was a minor malefactor in the events that led to these contested matters.  Other than cases filed by Morrison as a "partner" with UpRight, the

24

court is not aware of other ethical problems involving Morrison.  The court is convinced that Morrison—like other attorneys across the country—was enticed to join the UpRight team as a "partner" with visions of getting in on the ground floor of an emerging consumer bankruptcy industry that promised to disrupt the conventional manner in which bankruptcy clients are retained, not unlike Amazon's impact on the consumer retail business. Only time will tell if UpRight's business model of attracting new clients through the internet will succeed. But if it does, at least in this court, it will succeed only because UpRight and similar internet-based "firms" comply with traditional ethical standards and the requirements of the Code and Rules.

\* \* \*

Thus, based on the court's perception of Morrison's involvement in these matters, the court will not bar her from practicing in this District beyond sixty days, but once the sixty days expires, she must not accept referrals, or otherwise be associated with UpRight in this District, until UpRight's authority to practice within this District is reinstated.

As previously noted, UpRight appealed the Bankruptcy Court's order to the District Court, which affirmed, and they now seek a "second review" with us.

### III.

We begin by addressing a threshold issue: whether the Bankruptcy Court had authority to impose sanctions.  The Bankruptcy Court found that the Attorney Disclosures contained "untrue and misleading" statements in violation of several statutory provisions and rules, but we need only consider one. *Amlong & Amlong,*

25

*P.A.,* 500 F.3d at 1238 (when district court relies on multiple sources of authority for imposing sanctions, appellate court need only decide if they "were permissible under at least one of those sources of authority"). As earlier noted, § 526(a)(2) provides that a debt relief agency shall not make any statement in a bankruptcy court filing that it knew (or reasonably should have known) was untrue or misleading. If a debt relief agency is found to have intentionally violated this provision, or found to have engaged in a "clear and consistent pattern or practice" of doing so, the bankruptcy court can impose sanctions. That is what the Bankruptcy Court here found and did, and we see no clear error in its doing so.

UpRight's Attorney Disclosures were "misleading" within the meaning of § 526(a)(2) because they suggested that UpRight was authorized and able to charge extra fees to Covered Clients for Excluded Services. UpRight knew that, per Paragraph 6 of the Settlement Agreement, it was not allowed to charge such fees. Yet, as Menditto testified, the Attorney Disclosures "represented to the world" that UpRight could. The disclosures might have misled some of the Covered Clients to believe that they were not entitled to Excluded Services for no extra charge, even though they were. That was a violation of § 526(a)(2) and was alone enough to authorize the Bankruptcy Court to impose sanctions.[6]

---

[6] UpRight briefly argues on appeal, as they did below, that they didn't really violate the terms of the Settlement Agreement because Paragraph 6 only prohibited them from *charging* Covered Clients for the Excluded Services, and there is no evidence they did that. Because we

Indeed, it is worth reemphasizing that UpRight's counsel told the Bankruptcy Court at the hearing on the motions to examine that: "[T]he BA is correct, mistakes were made in those particular filings.  They should not have been made."  And then at the later evidentiary hearing on the order to show cause, UpRight's Associate General Counsel of Litigation testified similarly that "mistakes" were made in the Attorney Disclosures, and he admitted they were "inconsistent" with Paragraph 6.  They were acknowledging the undisputed facts in the record.

Conceding that there may have been sanctionable violations, UpRight advances four arguments why the sanctions should be reversed (in whole or in part), notwithstanding the violations.

### A.

UpRight first argues that the Bankruptcy Court didn't have subject matter jurisdiction to impose sanctions in some or all six of the Post-Settlement Cases. There are two separate bases for this jurisdictional argument.

First, UpRight points out that three of the Post-Settlement Cases (the Closed Cases) were closed at the time the Bankruptcy Court imposed sanctions—and they were never reopened—so they argue the court lost jurisdiction over those cases.

---

are affirming the Bankruptcy Court's sanctions on the basis of § 526(a)(2), we need not decide whether UpRight violated the Settlement Agreement.

This argument is unsupported in the law.  *See In re White-Robinson*, 777 F.3d 792, 795-96 (5th Cir. 2015) (bankruptcy court retained jurisdiction to impose sanctions against attorney notwithstanding debtor's bankruptcy discharge); *Koehler v. Grant*, 213 B.R. 567, 569 (8th Cir. BAP 1997) (bankruptcy court had jurisdiction to impose sanctions in case that "was closed before the contempt hearing" because jurisdiction "does not end once a plan is confirmed or the case is closed"); *see also, e.g., In re T.H.*, 529 B.R. 112, 134 (E.D. Va. 2015) (noting that bankruptcy court's jurisdiction to impose sanctions "is not affected by the status of a [bankruptcy] case, whether dismissed or closed, or by whether a discharge has been entered") (collecting multiple additional cases).  In fact, the case that UpRight cites for their argument, *Iannini v. Winnecour*, 487 B.R. 434 (W.D. Pa. 2012), says the same thing.  *See id.* at 441-42 (citing cases to support view that bankruptcy courts retain jurisdiction to impose sanctions after the underlying bankruptcy case is closed).  In short, the Bankruptcy Court did not lack subject jurisdiction to impose sanctions in the Closed Cases just because they were, in fact, closed cases.[7]

---

[7] This Court has said the same in several non-bankruptcy cases.  *See, e.g., Hyde v. Irish,* 962 F.3d 1306, 1309, 1310 (11th Cir. 2020) (court can address sanctions motion "even if it lacks jurisdiction over the underlying case"); *Mahone v. Ray*, 326 F.3d 1176, 1180 (11th Cir. 2003) ("As both the Supreme Court and we have recognized, Rule 11 motions [for sanctions] raise issues that are collateral to the merits of an appeal, and as such may be filed even after the court no longer has jurisdiction over the substance of the case."); *Didie v. Howes*, 988 F.2d 1097, 1103 (11th Cir. 1993) (stating "a district court has the authority to consider and rule upon the collateral issue of sanctions, although the case from which allegedly sanctionable conduct arose is no longer pending," because "a determination on sanctions is not a judgment on the merits, but a decision as to whether an attorney has abused the judicial process").

28

UpRight's second jurisdictional argument is based on *Kokkonen v. Guardian Life Insurance Company of America*, 511 U.S. 375 (1994), and several cases citing that decision.  In *Kokkonen,* a unanimous Supreme Court said that because federal courts are courts of limited jurisdiction, an order that merely approves a settlement and dismisses a case based on that settlement isn't by itself enough for the federal court to retain jurisdiction to enforce the settlement.  Instead, a district court will retain jurisdiction over the settlement agreement if the court "embod[ies] the settlement contract in its dismissal order (or, what has the same effect, retain[s] jurisdiction over the settlement contract) if the parties agree."  *Id.* at 381-82.  This Court has read *Kokkonen* as follows: "[I]f the district court either incorporates the terms of a settlement into its final order of dismissal or expressly retains jurisdiction to enforce a settlement, it may thereafter enforce the terms of the parties' agreement."  *Am. Disability Ass'n, Inc. v. Chmielarz*, 289 F.3d 1315, 1320 (11th Cir. 2002).  Absent such action, however, a party's failure to comply with the terms of a settlement agreement will generally present a state breach of contract action, "*unless there is some independent basis for federal jurisdiction*."  *See Kokkonen,* 511 U.S. at 382 (emphasis added).

In this case, UpRight notes that the Agreed Order "approved" the Settlement Agreement, but it didn't incorporate the agreement or any of its terms.  But as the BA points out, *Kokkonen* is inapplicable here because there *is* "some independent

29

basis for federal jurisdiction," i.e., the bankruptcy provisions on which the BA had moved and on which the Bankruptcy Court relied in imposing sanctions. The specific matters that the Bankruptcy Court was called on to consider (UpRight's compliance with the Bankruptcy Code and Rules as they pertain to the Settlement Agreement and the court's Agreed Order) provide independent grounds for federal jurisdiction over the attorneys. The Bankruptcy Court therefore had subject matter jurisdiction over the Settlement Agreement to discipline the attorney conduct that implemented it. And that is what it did. We also recognize that in this matter, the Settlement Agreement itself was between UpRight and the BA with respect to the *federal* Bankruptcy Code and Rules and UpRight's *future* filings and proceedings within the Bankruptcy Court. Obviously, a breach of that agreement should not present a *state* breach of contract action. It is difficult to see how the Bankruptcy Court could not have independent jurisdiction to deal with that implementation.[8]

## B.

UpRight next argues that the Bankruptcy Court violated their due process rights when it acted and imposed relief pursuant to § 707, § 526, and Rule 2016

---

[8] Notably, the BA argued in its brief on appeal that § 707, § 526, and Rule 2016 provided independent bases for federal jurisdiction under *Kokkonen*, and UpRight didn't argue otherwise in their reply brief, impliedly conceding the point. Instead, UpRight only argued in its reply that those bases weren't cited in the order to show cause and weren't mentioned at the subsequent evidentiary hearing, so those jurisdictional sources "were no longer pending at the time of the Hearing." This dovetails into UpRight's second argument on appeal, which we will discuss in the text above.

30

because they weren't provided notice that those particular sources were in play.

Specifically, UpRight argues that they went to the evidentiary hearing believing

that the Bankruptcy Court—per its order to show cause—was only considering

sanctions for violating the Settlement Agreement.  According to UpRight, the show

cause order and evidentiary hearing "provided no hint," made "[no] reference," and

gave them "no reason to suspect" that sanctions might be imposed on any statutory

provision or rule, which violated due process.  UpRight is wrong on both the facts

and the law.

As for the facts, the following testimony was elicited by counsel for the BA

from Menditto on cross examination:

> Q: Let's assume that UpRight per the language of
> paragraph 6 didn't violate it, i.e., they didn't collect any
> additional fees.  That's the caveat.  Assuming that's true,
> doesn't UpRight Law still have an obligation to file 2016
> disclosures that are correct?
>
> A: It is obligated to do that.
>
> Q: Doesn't UpRight Law have obligations under the
> rules of professional conduct to make sure clients
> understand the scope of services that are in play?
>
> A: It does.
>
> Q: You would agree that UpRight Law is a debt relief
> agency?
>
> A: It is.

31

Q: As a debt relief agency, isn't UpRight Law required [under § 526] not to make any misleading or untrue filings in court?

A: It is.

Q: Okay.  Isn't an attorney that signs the petition under 704 [*sic*; should be § 707(b)(4)] for anything that gets filed supposed to verify the accuracy to the best of their knowledge—I'm using the language loosely, but to the best of their knowledge that it's accurate what's filed?

A: That's correct.

\* \* \*

Q: Does UpRight Law have an obligation to amend disclosures under [Rule] 2016(b) when circumstances change that make the disclosure initially filed not accurate or not a complete picture?

A: Correct.

Immediately after asking these questions, the BA asked Menditto if he disputed that UpRight had filed inaccurate Attorney Disclosures, and although Menditto said that his answer "does not neatly fall into yes or no," he ultimately conceded that the language in the disclosures was "inconsistent" with Paragraph 6 of the Settlement Agreement.  In light of the preceding exchange, it is simply inaccurate for UpRight to contend that there was "no hint," "[no] reference," and

32

"no reason to suspect" that sanctions under those sources were being argued by the BA at the hearing and contemplated by the Bankruptcy Court.[9]

As for the law, due process is ultimately about fairness. *Lassiter v. Dep't of Soc. Servs. of Durham, Cty., N.C.*, 452 U.S. 18, 24 (1981) (observing that although "due process" cannot be precisely defined, "the phrase expresses the requirement of 'fundamental fairness' . . . in a particular situation"). In the context of sanctions, this Court said as follows in *In re Mroz*, 65 F.3d 1567 (11th Cir. 1995):

> Due process requires that the attorney (or party) be given fair notice that his conduct may warrant sanctions and the reasons why. Notice can come from the party seeking sanctions, from the court, or from both. In addition, the accused must be given an opportunity to respond, orally or in writing, to the invocation of such sanctions and to justify his actions.

*Id.* at 1575-76 (internal citations omitted).

On the facts presented, UpRight had ample notice that the BA was alleging that they had violated § 707, § 526, and Rule 2016, and that they were potentially subject to sanctions thereunder, including: (1) the BA's motions to examine; (2) the hearing on those motions; (3) the show cause order (which was based on the

---

[9] In support of their claim that the sole focus of the evidentiary hearing was on whether they should be held in contempt for violating the Settlement Agreement—and not whether they violated § 707 and/or § 526—UpRight points out that a word search for the terms "707" and "526" in the transcript of the hearing yields no results. However, as indicated in the bracketed language above, that's merely because § 526 was only mentioned by necessary implication and § 707(b)(4) was mistakenly referred to as § 704.

33

motions to examine and was issued after the hearing on the motions); (4) the evidentiary hearing on the show cause order (where, as just noted, those sources were referenced on cross examination); and (5) the post-cause hearing briefing. Because adequate notice came from both the BA and the Bankruptcy Court, and UpRight had a reasonable opportunity to respond both orally and in writing, the fundamental fairness of due process was met.

## C.

UpRight next argues that the Bankruptcy Court applied the wrong legal standard in imposing the suspensions (or practice injunctions) pursuant to § 105. This argument is moot, however, because by the time this case proceeded to oral argument before us, the suspension periods had run and The UpRight Law Firm and Morrison were out from under their respective suspensions.  The law has long recognized that the appeal of a suspension is rendered moot when the suspension period has expired.  For example, in *Alejandrino v. Quezon*, 271 U.S. 528 (1926), a member in the Philippines Senate, Jose Alejandrino, was suspended one year for assaulting another member of the Senate.  He filed suit challenging his suspension and took it all the way to Supreme Court, but by the time the case got there he had already served his full suspension.  In dismissing the case, a unanimous Court said as follows: "We do not think that we can consider this question, for the reason that the period of suspension fixed in the resolution has expired, and, so far as we are

advised, Alejandrino is now exercising his functions as a member of the Senate.  It is therefore in this court a moot question whether or not he could be suspended in the way in which he was." *Id.* at 532.  Thus, to the extent that UpRight argues the suspensions imposed pursuant to § 105 constituted an impermissible obey-the-law injunction that was punitive in nature and not a civil sanction, we cannot (and do not) reach that argument.[10]

## D.

For their fourth and final argument, UpRight contends that their conduct was unintentional and that the sanctions imposed were grossly excessive.  To the extent UpRight focuses this argument on the non-monetary suspension sanctions, which they claim were punitive in nature, the argument has become moot (as just noted) since the suspensions have already been served.  That leaves only the $150,000 monetary sanctions for us to consider.

UpRight contends that the Bankruptcy Court "went out of its way to portray UpRight in a negative light."  We agree that the Bankruptcy Court utilized strong language in describing The UpRight Law Firm.  It referred to the firm as a "high-volume, monolithic . . . internet cartel" and "bankruptcy mill" that was motivated purely by "profits" as opposed to "public service."  The Bankruptcy Court made

---

[10] We note that counsel for UpRight impliedly conceded the point at the conclusion of oral argument in this case, when he acknowledged that the suspensions have been served and said the monetary sanctions are the only reason this case is still here.

35

repeated references to ethical problems with the firm's business model, going so far as to imply that it wanted to put them out of business (at least for a little while). And it engaged in a lengthy discussion of the Sperro/Fenner repo scam even though it was not directly relevant to the violative conduct at issue and (as the BA had indicated) there wasn't conclusive evidence (at least none put before the Bankruptcy Court in *this* case) that UpRight was culpable in that scheme.

On the other hand, UpRight clearly violated § 526, and the Bankruptcy Court—which had the opportunity to the see the UpRight witnesses at the evidentiary hearing firsthand, observe their demeanor, and assess their credibility—found them to be "arrogant" and "indifferent" and their defenses "incredulous" and "absurd."  The Bankruptcy Court felt that the previous sanctions failed to get UpRight's attention; and although there were only six Post-Settlement Cases filed, it found there would have been no difference in their conduct had there been one hundred cases instead of six.[11]  Viewed in totality, the evidence supports a finding of a "clear and consistent pattern or practice."  11 U.S.C. § 526(c)(5).

Ultimately, while we may not have employed certain of the language that the Bankruptcy Court used—and while we might have imposed different sanctions ourselves—we agree that serious sanctions were appropriate.  The record indicates

---

[11] To be sure, the fact that UpRight argued that they didn't initially believe they had done anything wrong in the original Attorney Disclosures would seem to indicate that, had there been more Covered Clients, there would have been more violations.

36

that monetary sanctions of $25,000 per case seem to be the normal sanction for serious violations in this Bankruptcy Court.  It is worth pointing out in this regard that the $150,000 constituted $25,000 for each of the Post-Settlement cases, and $25,000 per case is exactly what UpRight had agreed to settle the *Cook* and *Mikulin* matters that gave rise to the Settlement Agreement in the first place.  We conclude in light of our highly deferential standard of review that the monetary sanctions that were imposed weren't grossly excessive and didn't fall outside the reasonable "range of choice" that was available to the Bankruptcy Court.  *See Frazier*, 387 F.3d at 1259.

## IV.

As stated at the outset of this opinion, bankruptcy practitioners are required to comply with the bankruptcy statute and its implementing rules.  If they don't, they can be sanctioned—and they know that.  For all the reasons discussed above, the Bankruptcy Court did not commit clear error in finding that UpRight violated the Bankruptcy Code and Rules of Bankruptcy Procedure, and it did not abuse its broad discretion in imposing sanctions for those violations.  Thus, the Bankruptcy Court's order and the District Court's order affirming it are **AFFIRMED**.

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

August 21, 2020

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  19-11405-GG
Case Style:  Law Solutions of Chicago LLC, et al v. J. Corbett
District Court Docket No:  1:18-cv-00677-AKK
Secondary Case Number:  17-bkc-40093-JJR7

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing, are available at www.ca11.uscourts.gov.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against appellants.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Joseph Caruso, GG at (404) 335-6177.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs